UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

| | |
|---|---|
| DARCY E. VELDING, ) | |
| ) | |
| Plaintiff, ) | Case No. 1:13-cv-684 |
| ) | |
| v. ) | Honorable Janet T. Neff |
| ) | |
| COMMISSIONER OF ) | |
| SOCIAL SECURITY, ) | |
| ) | **REPORT AND RECOMMENDATION** |
| Defendant. ) | |
| _____) | |

This is a social security action brought under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security finding that plaintiff was not entitled to disability insurance benefits (DIB). On July 19, 2010, plaintiff filed her application for benefits. (Page ID 49, 161-67). She initially alleged a June 4, 2009, onset of disability. (Page ID 161). She later amended her claim to allege a November 30, 2009, onset of disability. (Page ID 95, 206). Plaintiff's claim was denied on initial review. (Page ID 98-109). On June 5, 2012, she received a hearing before an ALJ, at which she was represented by counsel. (Page ID 66-96). On August 8, 2012, the ALJ issued her decision finding that plaintiff was not disabled. (Op., Page ID 49-60). On May 21, 2013, the Appeals Council denied review and the ALJ's decision became the Commissioner's final decision. (Page ID 30-32).

Plaintiff filed a complaint seeking judicial review of the Commissioner's decision. She argues that the Commissioner's decision should be overturned on the following grounds:

  1. The ALJ committed reversible error by giving weight to the opinion of a single decision maker, mistakenly believing it to be the opinion of an acceptable medical source; and

  2.  The ALJ failed to properly weigh medical opinion evidence and apply the treating physician rule.

(Plf. Brief at 1, docket # 14, Page ID 609). I recommend that the Commissioner's decision be affirmed.

## Standard of Review

When reviewing the grant or denial of social security benefits, this court is to determine whether the Commissioner's findings are supported by substantial evidence and whether the Commissioner correctly applied the law. *See Elam ex rel. Golay v. Commissioner*, 348 F.3d 124, 125 (6th Cir. 2003); *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001). Substantial evidence is defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Heston v. Commissioner*, 245 F.3d 528, 534 (6th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see Rogers v. Commissioner*, 486 F.3d 234, 241 (6th Cir. 2007). The scope of the court's review is limited. *Buxton*, 246 F.3d at 772. The court does not review the evidence *de novo*, resolve conflicts in evidence, or make credibility determinations. *See Ulman v. Commissioner*, 693 F.3d 709, 713 (6th Cir. 2012); *Walters v. Commissioner*, 127 F.3d 525, 528 (6th Cir. 1997). "The findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive . . . ." 42 U.S.C. § 405(g); *see McClanahan v. Commissioner*, 474 F.3d 830, 833 (6th Cir. 2006). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. . . . This is so because there is a 'zone of choice' within which the Commissioner can act without fear of court interference." *Buxton*, 246 F.3d at 772-73. "If supported by substantial evidence, the [Commissioner's] determination must stand regardless of whether the reviewing court would resolve the issues of fact in dispute differently." *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993); *see*

*Gayheart v. Commissioner*, 710 F.3d 365, 374 (6th Cir. 2013) ("A reviewing court will affirm the Commissioner's decision if it is based on substantial evidence, even if substantial evidence would have supported the opposite conclusion."). "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Commissioner*, 336 F.3d 469, 477 (6th Cir. 2003); *see Kyle v. Commissioner*, 609 F.3d 847, 854 (6th Cir. 2010).

### Discussion

The ALJ found that plaintiff met the disability insured requirement of the Social Security Act from June 4, 2009, through the date of the ALJ's decision. (Op. at 3, Page ID 50). Plaintiff had not engaged in substantial gainful activity on or after June 4, 2009. (*Id.*). Plaintiff had the following severe impairments: Arnold-Chiari malformation status post 2002 craniectomy, laminectomy and decompression surgery, occipital neuralgia, right shoulder tendinitis, and cervical spondylosis. (*Id.*). Plaintiff did not have an impairment or combination of impairments that met or equaled the requirements of the listing of impairments. (*Id.* at 5, Page ID 53). The ALJ found that plaintiff retained the residual functional capacity (RFC) for a range of sedentary work:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she requires the option to alternate between sitting and standing at will. She can only occasionally lift, carry, push or pull within sedentary parameters. The claimant can never crawl, or climb ladders, ropes or scaffolds, and can only occasionally balance, stoop, kneel, crouch, or climb ramps or stairs. She can only occasionally reach in any direction, including overhead. The claimant can rotate, flex, or extend her neck for no more than 50% of the workday. She should avoid all exposure to vibrations, hazardous machinery use/exposure, or unprotected heights exposure. Work is limited to unskilled jobs as defined in the DOT with SVP levels of 1 or 2, with simple, routine tasks that can be learned in approximately 30 days involving no more than simple work-related decisions with few workplace changes.

(Op. at 5, Page ID 53). The ALJ found that plaintiff's testimony regarding her subjective limitations was not fully credible. (*Id.* at 5-11, Page ID 53-59). The ALJ found that plaintiff was unable to perform any past relevant work. (*Id.* at 11, Page ID 59). Plaintiff was 38 years old as of her alleged onset of disability and 41 years old as of the date of the ALJ's decision. Thus, at all times relevant to her claim for DIB benefits, plaintiff was classified as a younger individual. (*Id.*). Plaintiff has at least a high-school education and is able to communicate in English. (*Id.*). The transferability of job skills was not material to a disability determination. (*Id.*). The ALJ then turned to the testimony of a vocational expert (VE). In response to a hypothetical question regarding a person of plaintiff's age, and with her RFC, education, and work experience, the VE testified that there were approximately 12,000 jobs in Michigan that the hypothetical person would be capable of performing. (*Id.* at 11-12, Page ID 59-60; *see* Page ID 92-93). The ALJ found that this constituted a significant number of jobs. Using Rule 201.28 of the Medical-Vocational Guidelines as a framework, the ALJ held that plaintiff was not disabled. (Op. at 11-12, Page ID 59-60).

**1.**

Plaintiff argues that the ALJ committed reversible error by giving weight to the opinion of a single decision maker, mistakenly believing it to be the opinion of an acceptable medical source. (Plf. Brief at 10, Page ID 618; *see also* Reply Brief at 1-3, Page ID 643-45). Ms. April Eldridge was the "disability adjudicator" or "single decision maker"[1] who denied plaintiff's claim for DIB benefits at the initial review stage. (Page ID 109). The ALJ made an error when she addressed Ms. Eldrige's opinion regarding plaintiff's RFC as if it had been the opinion of a non-examining consultant based

---

[1] The single decision maker (SDM) model is an experimental modification of the disability determination process. It eliminates the reconsideration level of review and allows a claimant to go directly from the initial denial to the ALJ hearing level. 20 C.F.R. § 404.906(b)(2).

on the limited evidence available in January 2011. (Op. at 8-9, Page ID 56-57). The ALJ's error was harmless, however.[2] *See White v. Commissioner*, No. 12-cv-12833, 2013 WL 4414727, at * 8-10 (E.D. Mich. Aug. 14, 2013). The ALJ rejected Ms. Eldrige's opinion that plaintiff was capable of performing light work because more recent evidence demonstrated that plaintiff was limited to sedentary work. (Op. at 8-9, Page ID 56-57). The ALJ found that plaintiff could not perform light work and found that plaintiff retained the RFC for a limited range of sedentary work with a sit/stand option. Further, the ALJ's factual finding regarding plaintiff's RFC (Op. at 5-11, Page ID 53-59) is supported by substantial evidence. I find no basis for disturbing the Commissioner's decision.

**2.**

Plaintiff argues that the ALJ failed to give appropriate weight to the opinion of a treating physician, Daniel Mankoff, M.D. (Plf. Brief at 11-18, Page ID 619-26; Reply Brief at 3-5, Page ID 645-47). The issue of whether the claimant is disabled within the meaning of the Social Security Act is reserved to the Commissioner. 20 C.F.R. § 404.1527(d)(1); *see Warner v. Commissioner*, 375 F.3d 387, 390 (6th Cir. 2004). A treating physician's opinion that a patient is disabled is not entitled to any special significance. *See* 20 C.F.R. §§ 404.1527(d)(1), (3); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007); *Sims v. Commissioner*, 406 F. App'x 977, 980 n.1 (6th Cir. 2011) ("[T]he determination of disability [is] the prerogative of the Commissioner, not the treating

---

[2]The Supreme Court has cautioned appellate courts against becoming "impregnable citadels of technicality." *Shinseki v. Sanders*, 556 U.S. 396, 407 (2009). "No principle of administrative law or common sense requires [this court] to remand a case in quest of a perfect opinion unless there is reason to believe that remand might lead to a different result." *Kornecky v. Commissioner*, 167 F. App'x 496, 507 (6th Cir. 2006) (quoting *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989)).

physician."). Likewise, "no special significance"[3] is attached to treating physician opinions regarding the credibility of the plaintiff's subjective complaints, RFC, or whether the plaintiff's impairments meet or equal the requirements of a listed impairment because they are administrative issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d)(2), (3); *see Allen v. Commissioner*, 561 F.3d 646, 652 (6th Cir. 2009).

Generally, the medical opinions of treating physicians are given substantial, if not controlling deference. *See Johnson v. Commissioner*, 652 F.3d 646, 651 (6th Cir. 2011). "[T]he opinion of a treating physician does not receive controlling weight merely by virtue of the fact that it is from a treating physician. Rather, it is accorded controlling weight where it is 'well supported by medically acceptable clinical and laboratory diagnostic techniques' and is not 'inconsistent . . . with the other substantial evidence in the case record.'" *Massey v. Commissioner*, 409 F. App'x 917, 921 (6th Cir. 2011) (quoting *Blakley v. Commissioner*, 581 F.3d 399, 406 (6th Cir. 2009)). A treating physician's opinion is not entitled to controlling weight where it is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" or is "inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see Gayheart v. Commissioner*, 710 F.3d 365, 376 (6th Cir. 2013) (A treating physician's medical opinion is entitled to controlling weight where "two conditions are met: (1) the opinion 'is well supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" (citing 20 C.F.R. § 404.1527(c)(2)). The ALJ "is not bound by conclusory statements of doctors, particularly where they are unsupported by

---

[3]"We will not give any special significance to the source of an opinion on issues reserved to the Commissioner described in paragraphs (d)(1) and (d)(2) of this section." 20 C.F.R. § 404.1527(d)(3).

detailed objective criteria and documentation." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001). An opinion that is based on the claimant's reporting of her symptoms is not entitled to controlling weight. *See Young v. Secretary of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990); *see also Francis v. Commissioner*, 414 F. App'x 802, 804 (6th Cir. 2011) (A physician's statement that merely regurgitates a claimant's self-described symptoms "is not a medical opinion at all.").

Even when a treating source's medical opinion is not given controlling weight, it should not necessarily be completely rejected; the weight to be given to the opinion is determined by a set of factors, including treatment relationship, supportability, consistency, specialization, and other factors. *See Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions*, SSR 96-2p (reprinted at 1996 WL 374188 (SSA July 2, 1996)); 20 C.F.R. § 404.1527(c); *Martin v. Commissioner*, 170 F. App'x 369, 372 (6th Cir. 2006).

The Sixth Circuit has held that claimants are "entitled to receive good reasons for the weight accorded their treating sources independent of their substantive right to receive disability benefits." *Smith v. Commissioner*, 482 F.3d 873, 875-76 (6th Cir. 2007); *see Cole v. Astrue*, 661 F.3d 931, 937-38 (6th Cir. 2011); *Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004). "[T]he procedural requirement exists, in part, for claimants to understand why the administrative bureaucracy deems them not disabled when physicians are telling them that they are." *Smith*, 482 F.3d at 876; *see Gayheart v. Commissioner*, 710 F.3d at 376.

Plaintiff initially claimed a June 4, 2009, onset of disability. On that date, plaintiff was involved in a car accident in Arizona. (Page ID 79, 373). Plaintiff was an occupant of a car that was stationary when it was struck from behind by another car traveling at 20-25 miles per hour. Plaintiff was wearing a seatbelt. She reported that she experienced a headache and some neck discomfort,

-7-

but did not lose consciousness.[4] (Page ID 373). Plaintiff's x-rays were negative for fracture or subluxation. (Page ID 384, 388). Plaintiff's cranial MRI was unremarkable. (Page ID 390).

On June 18, 2009, plaintiff returned to Brian Giersch, M.D., her treating physician at Rehabilitation Medicine Associates. (Page ID 373). Plaintiff was seeing Dr. Giersch in connection with an injury reportedly sustained on March 14, 2009, while working as a nurse technician and helping a patient sit up in bed. (Page ID 375). Plaintiff indicated that her neck and shoulder discomfort had improved with the passage of time. (Page ID 375-76). On June 18, 2009, plaintiff reported significant aggravation of her pain. She stated that she did not seek medical attention in Arizona because she wanted to see her treating neurologist, Timothy Wei, M.D. (Page ID 373). Dr. Giersch found that plaintiff remained neurologically intact. (Page ID 373-74). On July 9, 2009, Dr. Giersch found that plaintiff exhibited good strength. She had diffuse discomfort in her right upper extremity. Her sensory examination was grossly normal and her reflexes were intact. He continued plaintiff's work restrictions which limited her to performing work that did not involve lifting, pushing, or pulling greater than 10 pounds. (Page ID 371). Dr. Giersch noted that plaintiff's July 20, 2009, cervical spine MRI did not reveal any evidence of an acute process. Dr. Giersch approved plaintiff's return to work with a restriction of no lifting, pushing, or pulling greater than 10 pounds. (Page ID 369, 382-83). On August 10, 2009, noting that it was working and that her condition was improving, Dr. Giersch continued the restriction. (Page ID 369).

---

[4]Plaintiff testified that she settled her lawsuit arising out of the accident for $30,000. (Page ID 71).

On September 4, 2009, Dr. Wei indicated that he would continue to treat plaintiff's headaches with periodic Botox injections and provide plaintiff with a prescription for Skelaxin to use on a p.r.n. basis for neck pain. (Page ID 427).

On September 21, 2009, plaintiff related to Dr. Giersch that she had recently seen Dr. Wei "who did not think that there were any significant findings as it relates to [plaintiff's] Arnold-Chiari malformation. (Page ID 365). Plaintiff reported to Dr. Giersch that Skelaxin and Valium were the only medications that had provided symptom relief. When Dr. Giersch approved a prescription for Skelaxin, plaintiff's response was that she did not want it and "it was really Valium that she wanted[.]" Dr. Giersch declined to prescribe Valium. (Page ID 366).

On October 2, 2009, plaintiff reported ongoing gradual improvement. (Page ID 362). Plaintiff's EMG tests were normal. Dr. Giersch summarized the unremarkable results as follows: "The results of testing today are normal. There is no electrodiagnostic evidence for a significant right cervical radiculopathy or plexopathy. There are no abnormalities involving conduction in the right median or ulnar nerves at this time." (*Id.*; *see also* Page ID 361, 363, 390, 503). Dr. Giersch was unable to identify any specific underlying pain generator for plaintiff, but nonetheless, continued the 10 pound weight restriction and added a restriction limiting plaintiff to an 8-hour workday. (Page ID 362).

October 20, 2009, Randolph Russo, M.D., of Orthopaedic Associates of Michigan (OAM) performed a consultative examination. (Page ID 596-99). Dr. Russo noted that plaintiff had been diagnosed with Chiari malformation and underwent surgical decompression in 2002. (Page ID 596). The MRI of plaintiff's cervical spine showed no evidence of an acute process. There was no etiology for the symptoms plaintiff reported. (Page ID 599). Dr. Russo indicated that plaintiff was

able to return to normal physical activities related to her employment before the car accident. (Page ID 599).

On October 30, 2009, plaintiff reported to Dr. Giersch that she was feeling better. Her motor examination showed good strength and her reflexes were normal. Dr. Giersch stated that although he did not have a definite soft tissue explanation for plaintiff's pain, he suspected that it was a strain that was slowly healing. (Page ID 360).

Plaintiff stopped working in late November 2009. Because the work plaintiff performed after the car accident was substantial gainful activity, she amended her claim to allege a November 30, 2009, onset of disability. (Page ID 95). On November 30, 2009, Dr. Giersch stated that he expected that plaintiff would continue to heal over time. Her strength was good and her reflexes were normal. (Page ID 359). On January 11, 2010, Dr. Giersch found that plaintiff's strength remained good and that her reflexes were intact. Plaintiff displayed some mild discomfort with flexion and extension of the head and neck. Plaintiff expressed interest in a referral to a pain clinic and Dr. Giersch made the referral. (Page ID 358). On March 8, 2010, Dr. Giersch noted that plaintiff's strength remained good and her reflexes were normal. Plaintiff asked for a letter regarding her discomfort. Dr. Giersch indicated that he would be happy to send a letter regarding plaintiff's "discomfort in the right upper extremity and neck although [he had] not been able to identify a definite pain generator in this particular case." (Page ID 357).

On April 1, 2010, plaintiff appeared at Michigan Pain Consultants, PC. (Page ID 406). Daniel Mankoff, M.D.,[5] noted that plaintiff's EMG test had returned normal results. Her MRI was

---

[5]Plaintiff had received limited treatment from Dr. Mankoff in the remote past. (Page ID 54, 229, 500-01, 504-05). This treatment took place years outside the period at issue which ran from plaintiff's amended onset date of disability date, November 30, 2009, through the date of the ALJ's

-10-

normal and x-rays of her cervical spine showed no evidence of instability or fracture. (*Id.*). Dr. Mankoff observed that plaintiff was a healthy appearing female in no acute distress. She was awake, alert, and oriented. Her reflexes were +1 and sensation was intact. She had a full range of motion in her shoulders. She retained a good, full range of cervical motion, but did have some increasing pain with extension. Plaintiff related significant tenderness over the right greater occipital nerve as well as in the right cervical paravertebral musculature. Dr. Mankoff indicated that the etiology of plaintiff's reported symptoms was "not entirely clear." (Page ID 407). Dr. Mankoff gave plaintiff right occipital and right central paravertebral injections and ordered additional tests. (*Id.*).

On April 15, 2010, plaintiff's bone scan was negative for active facet arthropathy. (Page ID 413). On May 10, 2010, plaintiff returned to Dr. Giersch. Upon examination, he found nothing to suggest that plaintiff had significant cervical radiculopathy. Plaintiff's reflexes were normal and her strength was good. She had a mild reduction in cervical flexion, but she retained full extension. Dr. Giersch noted that plaintiff had convinced herself that some type of occipital neuralgia was causing her symptoms. (Page ID 356).

On May 20, 2010, David Lowry, M.D., noted that plaintiff's cervical spine x-rays taken on May 3, 2010, showed no subluxation of the cervical spine. There was no evidence of any medical condition warranting surgical intervention. (Page ID 388).

On June 30, 2010, Min Zhu, M.D. gave plaintiff a Botox injection for her headaches. Although plaintiff tolerated the procedure relatively well, she fell down in a waiting room after experiencing a very brief vasovagal response. Plaintiff had no history of passing out. Dr. Zhu

---

decision, August 8, 2012.

advised Roger Edvensen, M.D.,[6] the physician that plaintiff had been seeing for depression management, that plaintiff appeared to be under a lot of stress related to the loss of her job, divorce from her husband, and move into a new apartment. (Page ID 417-18). On June 30, 2010, the CT scan of plaintiff's head showed no acute intracranial abnormality and the CT scan of her spine showed no fractures or loss of vertebral heights. Cervical spine alignment was maintained, paravertebral soft tissues appeared normal, and there was no evidence of significant degenerative changes in plaintiff's cervical spine. (Page ID 437-39).

On July 29, 2010, Dr. Russo conducted another medical examination. (Page ID 600-03). Plaintiff reported that she continued to perform light household chores. Her reflexes were symmetric. The MRI of her cervical spine showed "no evidence of disc herniation, central canal or neural foraminal stenosis." (Page ID 602). Her July 20, 2009, MRI showed "no evidence of an acute process. No etiology for the patient's symptoms." (*Id.*). Plaintiff's EMG study indicated normal nerve conduction. Dr. Russo found that the symptoms plaintiff reported were "diffuse, nonspecific and not associated with an identifiable generator, clinically or radiographically." (Page ID 602-03). Dr. Russo "did not identify findings of greater occipital neuralgia, but simply tenderness about the right side of her occipital region down into the right side of her cervical spine." (Page ID 603). Plaintiff did not describe the typical sensory pattern of this diagnosis. She did not demonstrate a clinical diagnosis of cervical radiculopathy or myleopathy. Dr. Russo recommended a psychological evaluation based on plaintiff's constellation of symptoms and her emotion ties to those symptoms which lacked objective support. Dr. Russo recommended a home exercise program

---

[6]Dr. Edvensen is an obstetrician-gynecologist. Although this record contains correspondence to Dr. Edvensen from other medical care providers, plaintiff elected not to submit any treatment records from Dr. Edvensen in support of her claim for DIB benefits.

and conditioning on a regular basis. Dr. Russo concluded his evaluation report as follows: "I can see no long-term disability associated with the present situation, I have no medical reason that limitations in her physical function need to be implemented based on the absence of findings on her clinical assessment and diagnostic studies. There is no medical contraindication to her resumption of normal physical activities." (Page ID 603).

On October 7, 2010, plaintiff reported to Dr. Mankoff that the right sided facet rhizotomy he had performed in June (Page ID 398) had resulted in a 60% reduction in her neck pain and headaches. Dr. Mankoff suspected that the diffuse discomfort that plaintiff continued to report were related to her right shoulder. Dr. Mankoff offered his opinion that plaintiff would not be able to return to her job as a nurse technician because it involved "significant bending, lifting, and twisting. She certainly is capable of [performing] a more light duty position[.]" (Page ID 472).

On November 15, 2010, Psychologist Edwin Kremer performed a consultative psychological examination. (Page ID 442-50). Plaintiff stated that she had children ages 13, 18, and 20, and had divorced her husband in 2009. (Page ID 445). She indicated that a typical day involved taking her son to school, lying on the couch and watching television, reading, working on the computer, going out to lunch, picking her son up from school and helping him with his homework, preparing supper, and spending the evening reading. (Page ID 444). Plaintiff stated that she had depression secondary to chronic pain and that Cymbalta was beneficial. (Page ID 445). Psychologist Kremer described plaintiff as outgoing and socially comfortable. There was no evidence of any psychiatric illness or mood disturbance. He found no evidence of a somatoform disorder. (Page ID 448). Psychologist Kremer noted that possible causes of plaintiff's slow recovery included stress related to a divorce involving infidelity, the car accident, and bankruptcy. (Page ID 450).

On November 23, 2010, plaintiff advised Timothy Thoits, M.D., that she had a positive response to management of her headaches with Botox and did not experience any significant side effects. (Page ID 537).

On November 30, 2010, Dr. Mankoff noted that it was five months after plaintiff's rhizotomy. She indicated that it had provided significant relief from her spondylosis and cervicogenic headaches. She reported increasing pain in her right shoulder. (Page ID 471).

On December 21, 2010, Psychologist Robert Baird performed a consultative psychological examination. (Page ID 451-56). Plaintiff did not have any history of psychiatric hospitalization. (Page ID 452). She had received a prescription for Cymbalta between May and September 2010, immediately after she discovered her husband's infidelity. (Page ID 451-52). She had been living in her own apartment with her 13-year-old since July 2010. (Page ID 452). Plaintiff's description of her daily activities was similar to those she had reported to Psychologist Kremer. (Page ID 453). Plaintiff's stream of mental activity was spontaneous and organized. Psychologist Baird offered a diagnosis of a depressive disorder, NOS. Psychologist Baird offered his opinion that plaintiff's mental status and current symptoms would not preclude employment. (Page ID 454-55).

On December 28, 2010, David Fennes, M.D., performed an MRI of plaintiff's right shoulder. Plaintiff had no muscle atrophy and her supraspinous tendon was unremarkable. The infraspinous muscle was of "normal caliber, however, there [was] high signal intensity in the distal tendon representing mild to moderate tendinosis without tear[.]" (Page ID 482).

On January 6, 2011, Tama Abel, M.D., performed a consultative examination. (Page ID 457-61). Plaintiff reported that she was able to drive and was independent in her activities of her daily living. (Page ID 457). Plaintiff reported that she had graduated from high school and attended

a year of college.  Her gait was normal. She was able to heel and toe walk.  Her grip strength was normal and her dexterity appeared unimpaired.  Her motor and sensory function was intact, with the exception of decreased sensation to light touch in the right hand at the 4th and 5th fingers.  Her straight leg raising tests were negative.  (Page ID 460).

On January 11, 2011, plaintiff reported recurrent right sided cervical discomfort.  Dr. Mankoff performed another right-sided cervical facet rhizotomy.  (Page ID 470).  On February 22, 2011, Dr. Mankoff noted that plaintiff's condition was somewhat improved.  He recommended that "continuing to treat her symptomatically."  (Page ID 496).  On March 22, 2011, plaintiff reported that her most recent facet injections had provided 70% relief for about three weeks.  (Page ID 497).  On July 14, 2011, plaintiff complained of recurrent bilateral cervical discomfort and was treated with a  right-sided cervical facet rhizotomy.  (Page ID 499).

On August 30, 2011, plaintiff advised Dr. Thoits that she averaged about "one migraine a month that occurs prior to the onset of her menses."  He continued treatment with Botox infusions.  (Page ID 549).

On September 8, 2011, Barabara Rounds, an occupational therapist at Barbara Rounds & Associates, LLC., performed a consultative examination.  (Page ID 527-34).  Ms. Rounds met with plaintiff, recorded her complaints, performed an evaluation, and completed a RFC questionnaire.  She offered her opinion that plaintiff was not capable of performing sedentary work on a full-time basis.  She asserted that plaintiff would likely have serious limitations as to pace and concentration and would likely miss 3 days or more of work and be tardy more than 3 days per month.  (Page ID 532).

The ALJ considered the work-preclusive RFC restrictions that Ms. Rounds suggested and found that they were entitled to little weight, but she did incorporate the sit/stand option that Rounds suggested into her factual finding regarding plaintiff's RFC:

> Barbara Rounds, a registered occupational therapist, conducted a residual functional capacity evaluation of the claimant in September of 2011 (Exhibit 15F). The claimant again described constant yet variable right side neck pain, as well as intermittent pain involving the right scapula, shoulder, and arm (*Id.* at 3). She reported that she was able to sit for 1 and ½ hours at a time, stand for 1 and ½ hours, walk for 1 and ½ hours, and lift up to 15 pounds (*Id.* at 4). The claimant asserted that she was independent with activities of daily living and light meal preparation, but that she required assistance with housework, grocery shopping, and laundry (*Id.*). Ms. Rounds observed that the claimant's gait was normal, while her right cervical rotation was slightly decreased, and her left rotation was moderately diminished, due to pain (*Id.* at 5). Although she moved her right shoulder in a guarded manner due to neck pain, she retained a full range of motion in each upper extremity (*Id.*). Ms Rounds concluded that the claimant appeared to be functioning within the sedentary work classification, but that she did not appear to be capable of engaging in such work activity on a full-time basis (*Id.* at 7). She explained that, due to the progressive nature of the claimant's symptoms, and her medications, she would most likely have serious limitations in concentration, persistence or pace, and would require a sit-stand option (*Id.*). Ms. Rounds further commented that the claimant would likely miss 3 days or more of work per month (*Id.*). The longitudinal evidence of record does not support such extreme functional limitations, however, and I give Ms. Rounds' assessment little weight in determining the claimant's residual functional capacity. Her gait was normal, and she was able to perform various activities of daily living. She has also retained a full range of motion in each extremity. As indicated below, I have accounted for the claimant's deficits in concentration, and her need for a sit-stand option, in my assessment of her residual functional capacity. As attested to by the vocational expert, there are still jobs existing in significant numbers which the claimant would be able to perform. I believe the findings of Dr. Russo are more consistent with the overall record.

(Op. at 9-10, Page ID 57-58).

On October 6, 2011, Dr. Mankoff marked the "yes" box on a form provided by plaintiff's attorney which is labeled as a "physical capacities assessment," and which inquired as follows: "Do you agree with the limitations described by Barbara Rounds, OTR in her REC evaluation on 9/8/11?" (Page ID 535). As Dr. Mankoff did not offer his own opinion regarding plaintiff's RFC, "there arguably exists no treating physician opinion to which [the treating physician rule] even

applies." *Belding v. Commissioner*, No. 1:13-cv-855, 2014 WL 5039443, at * 8 (W.D. Mich. Sept. 25, 2014). Further, nothing in this perfunctory document tied the restrictions suggested by Ms. Rounds to any medical findings found in Mankoff's progress notes or the results of any medical tests.

On October 31, 2011, plaintiff reported to Dr. Mankoff that she had a job pending at Biolife as a plasma technician. Dr. Mankoff described this as a "positive note" and expressed no doubts as to plaintiff's ability to perform the requirements of this work. (Page ID 585).

On December 6, 2011, plaintiff reported to Dr. Thoits that she had recently settled a year-long lawsuit with an insurance company. She stated that she was under a certain amount of stress at home. Dr. Thoits continued to treat plaintiff's headaches with Botox injections. (Page ID 443).

On January 12, 2012, plaintiff reported recurrent neck pain, primarily on the right side. She received another right-sided cervical facet rhizotomy because the procedure had provided "very good relief" in the past. (Page ID 575). On February 9, 2012, plaintiff reported that the rhizotomy provided some pain relief. Plaintiff reported right arm pain and tingling and numbness in two fingers. Dr. Mankoff scheduled a MRI to rule out the possibility of disc herniation or stenosis. On February 23, 2012, the MRI of plaintiff's cervical spine revealed no evidence of disc protrusion, significant disc bulging or central canal stenosis. (Page ID 570-71). On March 26, 2012, plaintiff reported that her pain had improved, but she still experienced "some burning dysestheslas, but these were improved as well. (Page ID 560). Dr. Mankoff administered a cervical epidural injection to address plaintiff's arm pain complaints. (Page ID 560).

On March 23, 2012, plaintiff was examined by Derek Lado, M.D. He found that plaintiff retained good strength throughout her right upper extremity. A nerve conduction study of plaintiff's

right upper extremity showed "normal median sensory, ulnar sensory and radial sensory response." Right median motor and ulnar response was normal. A needle exam of the right upper extremity showed "changes indicative of denervation with reinnervation at the right C7 myotomes, most consistent with a mild right C7 radiculopathy." (Page ID 565-67).

On May 17, 2012, Dr. Mankoff signed a one-paragraph letter offering his opinion that plaintiff was disabled. He stated that plaintiff could not stand or remain static for "prolonged periods." Plaintiff would be limited to sitting approximately 1 hour at a time. He stated that plaintiff had "essentially no range of motion of the cervical spine" and would be limited to lifting 5 pounds, and would need to stop and rest frequently and even lie down during the day. (Page ID 595).

The issue of disability is reserved to the Commissioner and Dr. Mankoff's opinion that plaintiff was disabled was entitled to no weight. 20 C.F.R. §§ 404.1527(d)(1), (3). "[T]he determination of disability [is] the prerogative of the Commissioner, not the treating physician." *Sims v. Commissioner*, 406 F. App'x 977, 980 n.1 (6th Cir. 2011). Similarly, the issue of RFC is reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d)(2), (3). The ALJ rejected the work-preclusive RFC restrictions that Mankoff had suggested because they were inconsistent with the underlying record, including plaintiff's documented functional range of motion, plaintiff's own reports that she could lift up to 15 pounds, and the lack of objective evidence supporting the proffered restrictions:

> A treating physician, Dr. Daniel Mankoff, stated in a May 2012 letter that the claimant's chronic neck pain, headaches, and radicular pain significantly limited her ability to sit or stand for prolonged periods of time (Exhibit 19F/1). He added that she essentially had no cervical spine range of motion and was limited to lifting 5 pounds (*Id.*). Dr. Mankoff further stated that the claimant had to stop and rest frequently, and concluded that he did not believe the claimant qualified for even a sedentary level position. (*Id.*). I do not give this opinion

> any weight however, as it is unsupported by the objective evidence of record. The claimant's most recent diagnostic studies prior to this revealed no significant cervical disc bulges, and good strength throughout the right arm. The claimant reported being able to lift up to 15 pounds in September 2011, and she was documented as having a functional cervical range of motion. Dr. Mankoff also simply indicated in an October of 2011 statement that he agreed with the assessment of Ms. Rounds, without any further elaboration (Exhibit 16F). I therefore also give this opinion no weight, for the reasons listed above.

(Op. at 10, Page ID 58). The extreme restrictions that Dr. Mankoff suggested were not well supported by objective evidence. The proffered restrictions were contrary to Dr. Mankoff's own treatment notes, including his observation that plaintiff was "certainly is capable of [performing] a more light duty position[.]" (Page ID 472). I find no violation of the treating physician rule.

### **Recommended Disposition**

For the reasons set forth herein, I recommend that the Commissioner's decision be affirmed.

Dated: July 22, 2015                              /s/  Phillip J. Green
                                                  United States Magistrate Judge

### **NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b). Failure to file timely and specific objections may constitute a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Keeling v. Warden, Lebanon Corr. Inst.*, 673 F.3d 452, 458 (6th Cir. 2012); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir. 2008). General objections do not suffice. *See McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).